IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

BENJAMIN YOUNG,                      )
                                     )
     Plaintiff,                      )
                                     )
v.                                   )    No. 23-cv-2327-BCL-tmp
                                     )
MILES GREENE, individually,          )
and UNITED PARCEL SERVICE,           )
                                     )
     Defendants.                     )
                                     )

_____

ORDER ON UPS'S MOTION FOR A PROTECTIVE ORDER
AND YOUNG'S MOTION TO COMPEL

_____

Before the court by order of reference are Defendant United Parcel Service's ("UPS") Motion for a Protective Order and Plaintiff Benjamin Young's Motion to Compel. (ECF Nos. 64, 65, 66, 85.) For the reasons below, the motions are GRANTED in part and DENIED in part.

## I.    BACKGROUND

This case was originally filed on May 23, 2023, with a First Amended Complaint filed on July 11, 2023. (ECF Nos. 2, 11.) Young's First Amended Complaint brings claims of defamation (slander) against Defendant Myles Greene, tortious interference with a business relationship against Greene, and retaliation under the Tennessee Disability Act ("TDA") and the Family Medical Leave Act ("FMLA") against UPS. (ECF No. 11; see also ECF No. 49 at PageID

166, Order Granting in Part and Denying in Part Defs.' Mot. for Judgment on the Pleadings.) On March 26, 2025, all claims against Greene were dismissed by the District Judge's Order Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings.[1] (ECF No. 49.) The court denied the motion as to the claims of retaliation against UPS under the TDA and FMLA. (Id. at PageID 175.)

The First Amended Complaint, as described by the District Judge's March 26 Order, alleges that Young, a former UPS employee who is white, was wrongfully terminated following an internal complaint made by Greene, who is Black. (ECF No. 49 at PageID 167.) Young alleges that in June 2022, Greene falsely reported to UPS management that Young had used a racial slur, ultimately leading to Young's termination on July 17, 2022.[2] (ECF No. 49 at PageID 167.) Young further alleges that he has diabetes, which substantially limits his ability to eat and work, and that UPS regarded him as disabled. (Id.) He contends he could perform his job's essential functions with certain accommodations, including intermittent medical leave. (Id.) Young claims UPS terminated him

---

[1] Pursuant to Administrative Order No. 2026-05 (Mar. 5, 2026), this case has been reassigned from District Judge Mark S. Norris to District Judge Brian C. Lea.

[2] Although the First Amended Complaint makes references to the parties' race, the complaint does not bring claims under federal or state law for race discrimination. (Id. (describing the claims in First Amended Complaint)).

- 2 -

in retaliation for requesting accommodations while treating similarly situated, non-disabled employees more favorably, specifically citing Willie Isom, a Black manager without a disability who allegedly engaged in misconduct but was retained. (Id.) Additionally, Young asserts he took intermittent FMLA leave for his diabetes and that shortly before his termination, he requested FMLA leave to care for his father, who has dementia. (Id. at PageID 168.) He alleges UPS failed to provide proper FMLA notices, made negative comments about his protected absence, and terminated him in retaliation for exercising FMLA rights. (Id.)

UPS offers a different account of the circumstances leading to Young's termination.[3] UPS contends that it conducted an internal investigation after receiving Greene's complaint and decided to terminate Young (who was Greene's supervisor) based on its determination that Young violated UPS's Professional Conduct and Anti-Harassment and Not in Our House Policies ("Employee Conduct Policies").[4] (ECF No. 76-2 at PageID 480, UPS's Mem. in Support of

_____

[3]The court will refer to UPS's pending motion for summary judgment for the limited purpose of providing context to the pending discovery motions. The court notes that Young has not yet responded to UPS's summary judgment motion. (See ECF No. 77, Pl.'s Verified Rule 56(d) Motion.)

[4]According to UPS,

> these policies prohibit the harassment of any person or
> group of persons based on race, sex, national origin,
> disability, sexual orientation, gender identity,
> veteran/military status, pregnancy, age, or religion.

Mot. for Summ. J.) UPS's account of the incident and ensuing investigation is as follows:

> Defendant [UPS] employed Plaintiff – who is White – as a supervisor until he told one of his subordinate employees, Myles Green – who is Black – that a piece of equipment was broken because Mr. Greene was acting like "a wild monkey." Mr. Greene understood Plaintiff's use of the phrase "wild monkey" to be race related and complained to UPS. During UPS's investigation of that complaint, Plaintiff admitted to making the remark (another witness corroborated it, as well). UPS Human Resources Manager Carl Bell reviewed the investigation and determined what discipline to impose. After his review, Mr. Bell determined that the remark violated Company policy and Plaintiff's employment should be terminated.

(Id.) As to Young's TDA and FMLA retaliation claims, UPS claims that:

> Plaintiff was diagnosed with non-insulin dependent diabetes on November 11, 2020. (SMF ¶ 14.) Between November 11, 2020 and Plaintiff's termination in July 2022, his diabetes impacted his workday only around six times, during which he would either have to go inside, go to his office, or eat a snack. (SMF ¶ 16.) By 2022, however, Plaintiff got a handle on his diabetes and stabilized his blood sugar levels. (SMF ¶ 17.) He has not been treated for his diabetes in the last three years. Plaintiff never missed work or requested leave because of his diabetes. (SMF ¶ 18.) Plaintiff concedes that his diabetes does not prevent him from doing anything in other areas of his life. (SMF ¶ 60.)

---

(SMF ¶ 4.) The policies also prohibit derogatory or other inappropriate remarks, slurs, threats or jokes. (Id.) The Professional Conduct and Anti-Harassment Policy mentions that a violation of the policy could result in disciplinary action, up to and including termination of employment, and the Not In [Our House] Policy is expressly noted as a zero-tolerance policy. (SMF ¶ 5.)

(Id. at PageID 481.)

> At some point around this same time, Plaintiff began assisting his mother with caring for his father, who had been diagnosed with dementia. (SMF ¶ 20.) On days when Plaintiff needed to miss work, he would use the paid time off he accrued while working for UPS. (SMF ¶ 21.) At some point during Plaintiff's employment, he looked into requesting [FMLA] leave at UPS but chose not to take FMLA leave because he preferred using his paid time off. (SMF ¶ 64.) In 2020 or 2021, UPS recommended that Plaintiff apply for FMLA leave to account for any absences associated with his diabetes or the care of his father. (SMF ¶ 63.) Plaintiff contends that he spoke with someone about taking FMLA leave (he does not know with whom he spoke or when). (SMF ¶ 65.)

(Id. at PageID 483-84.)

The issues raised by the Motion for a Protective Order and Motion to Compel stem from Young's Amended Notice of Rule 30(b)(6) Deposition of UPS ("Amended Notice"), which was served on UPS on August 17, 2025. (ECF No. 64-3.) The Amended Notice added thirty-three new topics to Young's previous Notice of Rule 30(b)(6) Deposition, which contained only twelve topics and was previously served on October 17, 2024. (ECF No. 64-1 at PageID 214-15.) The last day for depositions was August 25, 2025, pursuant to the court's order extending the deposition deadline. (ECF No. 61.) UPS filed its Motion for a Protective Order on August 22, 2025. (ECF No. 64.) Opposing UPS's motion, Young filed a Motion to Compel on August 25, 2025. (ECF No. 65.) Young filed a response to UPS's Motion for a Protective Order on September 9, 2025, and UPS filed a response to Young's Motion to Compel on the same day. (ECF Nos. 71, 72.)

- 5 -

## II.  ANALYSIS

### A.  Legal Standards

The scope of discovery is governed by Federal Rule of Civil Procedure 26(b)(1), which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. The party seeking discovery is obligated to demonstrate relevance. Billingsley v. Tracy, No. 20-cv-02570, 2024 WL 1543767, at *3 (W.D. Tenn. Apr. 9, 2024); see also United States ex rel. Griffis v. EOD Tech., Inc., No. 3:10-CV-204-TRM-DCP, 2024 WL 4920594, at *2 (E.D. Tenn. Apr. 23, 2024); Rogers v. City of Frankfort, No. 3:21-CV-00023-GFVT-EBA, 2023 WL 10675438, at *2 (E.D. Ky. Mar. 22, 2023). Upon a showing of relevance, the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case. Billingsley, 2024 WL 1543767, at *3; see also U.S. E.E.O.C. v. Aspire Reg'l Partners, Inc., No. 2:22-cv-3071, 2025 WL 1291454, at *2 (S.D. Ohio May 5, 2025); William Powell Co. v. Nat'l Indem. Co., No. 1:14-CV-00807, 2017 WL 1326504, at *5 (S.D. Ohio Apr. 11, 2017), aff'd sub nom. 2017 WL 3927525 (S.D. Ohio Jun. 21, 2017), and modified on reconsideration, 2017 WL 4315059 (S.D. Ohio Sept. 26, 2017). Six factors are relevant to proportionality: (1)

"the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The proportionality standard of Rule 26 applies to Rule 30(b)(6) depositions, and the party seeking discovery from a Rule 30(b)(6) witness bears the burden of showing the relevance of the information requested. See T.E. Connectivity Corp. v. Sumitomo Elec. Wiring Sys., Inc, No. 2:22-cv-10283, 2025 WL 1095360, at *1 (E.D. Mich. Apr. 11, 2025).

The TDA, codified at Tenn. Code Ann. § 8-50-103, prohibits employers from discriminating against employees "based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." (ECF No. 49 at PageID 173 (quoting Tenn. Code Ann. § 8-50-103(b)). To establish a *prima facie* case under the TDA, a plaintiff must show: (1) that plaintiff engaged in an activity protected by the relevant statutes; (2) that the exercise of plaintiff's civil rights were known by defendant; (3) that, thereafter, defendant took an employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and the adverse

employment action. (Id.) (citing Cardenas-Meade v. Pfizer, Inc.,
510 F. App'x 367, 372 (6th Cir. 2013) (citing Hollins v. Atl. Co.,
188 F.3d 652, 661 (6th Cir. 1999))). Courts interpret and apply
TDA claims under the same analytical framework as claims brought
under the Americans with Disabilities Act. (Id. at PageID 173-74)
(citing Cardenas-Meade, 510 F. App'x at 369 n.2) (citing Sasser v.
Quebecor Printing Corp., 159 S.W.3d 579, 584 (Tenn. Ct. App.
2004))).

With regard to a claim for FMLA retaliation, a plaintiff who
lacks direct evidence can establish a *prima facie* case of FMLA
retaliation by presenting evidence "(1) that [plaintiff] engaged
in protected activity, (2) that [defendant] knew about that
activity, (3) that [plaintiff] suffered an adverse action, and (4)
that the adverse action was causally connected with [plaintiff's]
protected activity." Adefurin v. Meharry Med. Coll., No. 25-5610,
2026 WL 594805, at *2 (6th Cir. Mar. 3, 2026). If the plaintiff
establishes a *prima facie* case, then the burden shifts to defendant
to articulate a legitimate, non-retaliatory reason for its adverse
action. Id. If defendant meets their burden, then the burden shifts
back to plaintiff to show that the reason is pretextual. Id. A
plaintiff can generally show pretext by demonstrating "(1) that
the employer's 'proffered reasons had no basis in fact, (2) that
the proffered reasons did not actually motivate the employer's
action, or (3) that they were insufficient to motivate the

employer's action." Id. (quoting Chen v. Dow. Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009)). "Pretext is a commonsense inquiry" where the court asks whether defendant took the adverse action against plaintiff "for the stated reason or not?" (Id.) (quoting Chen, 580 F.3d at 400 n.4).

**B.    Timeliness of Amended Notice**

In its Motion for a Protective Order, UPS argues that Young's Amended Notice was untimely. (ECF 64-1 at PageID 221-22.) It is undisputed that Young's Amended Notice was served on UPS only five business days before the close of discovery. (ECF Nos. 64-1 at PageID 22, 52 at PageID 181, 61 (granting UPS's Motion to Extend the Deposition Deadline and extending the deposition deadline to August 25, 2025).) UPS argues that "[t]his is insufficient time to prepare [] corporate witnesses and should not be deemed reasonable notice." (ECF No. 64-1 at PageID 222.) Based on the original notice, the Rule 30(b)(6) deposition of Carl Bell occurred on August 25, 2025. (ECF Nos. 71 at PageID 296, 72 at PageID 439.) However, the deposition did not include the new topics contained in the Amended Notice. (ECF Nos. 71 at PageID 296, 72 at PageID 439.)

In this case, Young had ample time to amend his Rule 30(b)(6) notice prior to the last few days of discovery. While Young certainly should have served the Amended Notice much sooner, and should have provided UPS with more time to prepare its witness,

- 9 -

the court finds good cause for Young to be permitted to take another Rule 30(b)(6) deposition, as modified by the court below.

## C.    Rule 30(b)(6) Deposition Topics

### 1.    Reason for Termination

In his first topic, Young requests "[t]he complete factual basis for Plaintiff's termination in July 2022, including identification of all decisionmakers involved in the termination decision, with names, titles, and roles, as well as whether they knew of Plaintiff's race or protected activity." (ECF Nos. 64-3 at PageID 237, 64-1 at PageID 224, 226-27, 72.) The court finds that information regarding the complete factual basis for Young's termination is certainly relevant and proportional to the needs of the case, even if, as UPS argues, Young has already received this information during written discovery. As to the specific "protected activity," for the sake of clarity, those will be limited to Young's (1) requesting accommodations and (2) requesting leave. UPS shall present a deponent prepared to testify about Young's first 30(b)(6) topic, as modified.

### 2.    Allegations of Racial Slur

Young requests 30(b)(6) testimony regarding "UPS's knowledge of the allegation that Plaintiff used a racial slur; investigative steps taken by UPS in the MidSouth District in response; all communications between UPS managers in the MidSouth District and Defendant Greene concerning Plaintiff." (ECF Nos. 64-3 at PageID

- 10 -

237, 64-1 at PageID 224, 226-27, 72.) Information regarding communications, decisionmakers, and investigations related to Young's termination is relevant and proportional to the needs of the case. However, again for the sake of clarity, the court will limit the time period to correspond with the dates surrounding this incident. Thus, topic two will be modified to read: UPS's knowledge of the allegation that Plaintiff used a racial slur toward Greene in June-July 2022; investigative steps taken by UPS in the MidSouth District in response; all communications between UPS managers in the MidSouth District and Greene concerning Plaintiff's alleged use of a racial slur toward Greene.

3.  <u>Comparator Evidence - Misconduct and Protected Class Status</u>

The third topic is "[i]dentification of UPS employees in the MidSouth District who, within the past five years, were accused of using racial or other offensive/illegal slurs (including based on gender, race, disability, or other protected classes); whether any nonwhite employees were accused of using racial slurs; the results of investigations; and the discipline imposed or not imposed. For each comparator, testimony concerning: (a) race; (b) whether UPS was aware the employee was disabled; (c) whether the employee requested an accommodation and UPS's response; (d) whether the employee requested or used FMLA leave; and (e) whether the employee

- 11 -

engaged in other protected activity." (Id. at PageID 237; ECF No. 64-1 at PageID 224, 226, 72.)

According to Young, topic three seeks to identify possible comparators, which he asserts is "routinely allowed in discrimination cases" and "is squarely discoverable." (ECF No. 71-2 at PageID 418 (citing Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751-52 (6th Cir. 2012)). However, Young's attempt to obtain race-based comparator discovery – "whether any nonwhite employees were accused of using racial slurs" - is not relevant, as Young has not brought any race discrimination claims against UPS. The only relevance for the information sought in topic three relates to Young's theory that UPS's reason for terminating him was pretext for unlawful retaliation. But as drafted, topic three would result in discovery of some irrelevant information, as well as relevant information that would not be proportional to the needs of the case. Although the court is under no obligation to re-write deposition topics that are overbroad on their face, the court will do so in an effort to bring closure to this last remaining discovery dispute.

The first clause of this topic, in which Young refers to the "MidSouth District," is too large a geographic area for this particular case. The court agrees with UPS that the reference to the "Midsouth District," which Young describes as "the UPS district encompassing Tennessee, Mississippi, Arkansas, and surrounding

operational areas under the oversight of UPS's MidSouth management during the period January 1, 2017 to the present," is vastly overbroad.[5] (ECF No. 64-3 at PageID 236, 72.) Thus, the language referring to the "MidSouth District" is stricken. The court finds that under the proportionality standard of Rule 26, a more appropriate geographic scope is all UPS Package Distribution Centers in the Memphis Metropolitan Area. This modification will encompass the Oakhaven Package Distribution Center, the facility at which Young was previously employed, (ECF No. 76-14 at PageID 540), as well as other Distribution Centers (if any) in the Memphis Metropolitan Area. The temporal limitation will also be shortened from five years to three years, specifically from May 23, 2020, to May 23, 2023. This three-year period covers the time before Young's diabetes diagnosis (November 11, 2020) through the filing of this lawsuit. This topic is further limited to providing information on

---

[5]Young's reliance on Bobo v. United Parcel Service, Inc., 665 F.3d 741 (6th Cir. 2012), to argue that he is entitled to such geographically broad discovery, is misplaced. At the trial court level, Bobo served notices to depose over fifty individuals one day before the discovery deadline. Bobo v. United Parcel Service, Inc., No. 2:08-cv-02238-SHM-cgc, 2009 WL 10664847 (W.D. Tenn. May 27, 2009) (Cohn, M.J.). Given this last-minute attempt to conduct voluminous discovery, the court denied the motion to compel and motion to extend discovery deadline. Id. On appeal, the Sixth Circuit reversed partly because Bobo by that time had "requested discovery on a small number [seven] of specific individuals outside each of those protected categories whom he alleged violated the UPS integrity policy[.]" Bobo, 665 F.3d at 753. Thus, Bobo does not stand for the proposition that a plaintiff is entitled to multi-state comparator discovery.

employees who were accused only of using racial slurs. See Bashaw v. Majestic Care of Whitehall, LLC, 130 F.4th 542, 551 (6th Cir. 2025). As for further information about these accused employees, the court finds that whether they had disabilities, requested accommodations, requested FMLA leave, or "engaged in other protected activity," is overbroad and not proportional to the needs of the case. And as stated above, information on the race of individuals accused of using a racial slur is irrelevant.

Therefore, topic three is modified to read as follows: Identification of UPS employees in Package Distribution Centers in the Memphis Metropolitan Area who, between May 23, 2020, and May 23, 2023, were accused of using racial slurs; the results of investigations; whether discipline was imposed or not imposed, and if so, what discipline.

### 4.    Specific Comparators – Named Employees

Topic four asks "[w]hether UPS ever investigated Quentin Goodwin for use of racial or other slurs, what he was investigated for, the results, and whether UPS had grounds to terminate him. Whether UPS ever investigated Naymeon Kelly for use of racial or other slurs, what he was investigated for, the results, and whether UPS had grounds to terminate him." (ECF Nos. 64-3 at PageID 237, 64-1 at PageID 226, 72.) The court finds that it is appropriate for Young to seek information regarding his theory that UPS's Employee Conduct Policies were not consistently enforced, which

- 14 -

could support his pretext argument. However, as before, information will be limited to the use of racial slurs only. Thus, the modified topic is as follows: Whether UPS ever investigated Quentin Goodwin for use of racial slurs, what he was investigated for, the results, and whether UPS had grounds to terminate him. Whether UPS ever investigated Naymeon Kelly for use of racial slurs, what he was investigated for, the results, and whether UPS had grounds to terminate him.

5.    Disability Accommodations

In topic five, Young requests information on "UPS's policies and practices in the MidSouth District regarding accommodation of employees with diabetes or other disabilities; Plaintiff's requests for accommodation and UPS's responses; other employees in the MidSouth District who requested accommodations in the last five years, the nature of those requests, and UPS's responses." (ECF Nos. 64-3 at PageID 237, 64-1 at PageID 224, 228, 72.) This topic, as drafted, is clearly overbroad. With regard to UPS's policies and practices surrounding diabetes and other accommodations, the MidSouth District will be limited to UPS Package Distribution Centers in the Memphis Metropolitan Area. Information on "other employees in the MidSouth District who requested accommodations in the last five years, the nature of

those requests, and UPS's responses," is clearly overbroad, not proportional to the needs of this case, and is stricken.

Thus, topic five will be modified to read: UPS's policies and practices in Package Distribution Centers in the Memphis Metropolitan Area regarding accommodation of employees with diabetes or other disabilities; Plaintiff's requests for accommodation and UPS's responses.

6.   FMLA Requests

Topic six reads: "UPS's policies and procedures in the MidSouth District concerning FMLA leave; Plaintiff's FMLA requests and how they were handled; other MidSouth District employees who requested FMLA leave in the last five years, whether such requests were granted, and whether adverse actions followed." (ECF No. 64-3 at PageID 237, 72.) With regard to UPS's FMLA policies, the court finds that the geographic range is once again too broad in its reference to the MidSouth District and will replace it with UPS Package Distribution Centers in the Memphis Metropolitan Area. As in topic five, information on any and all employees who requested FMLA leave is irrelevant, overbroad, and not proportional to the needs of this case. The topic is modified as follows: UPS's policies and procedures in Package Distribution Centers in the Memphis Metropolitan Area concerning FMLA leave for individuals

- 16 -

who requested leave; Plaintiff's FMLA requests and how they were handled.

### 7. Policies and Training

Topic seven states: "UPS's written policies applicable in the MidSouth District concerning discrimination, harassment, disability accommodation, and FMLA; training provided to supervisors and managers in the last five years on those subjects." (Id. at PageID 237; ECF No. 64-1 at PageID 224, 228, 72.) The court agrees with UPS that the MidSouth District is too broad and will replace this language with UPS Package Distribution Centers in the Memphis Metropolitan Area concerning the policies on discrimination, harassment, disability accommodations, and FMLA, and to the Oakhaven Package Distribution Center in the three years between May 23, 2020, and May 23, 2023, regarding training provided to supervisors and managers. Topic seven, as modified, will read: UPS's written policies applicable in UPS Package Distribution Centers within the Memphis Metropolitan Area concerning discrimination, harassment, disability accommodation, and FMLA; training provided to supervisors and managers at the Oakhaven Package Distribution Center in the three years between May 23, 2020, and May 23, 2023, on those subjects.

### 8. Cardinal Principles

The eighth topic requests "UPS's 'Cardinal Principles,' what they are, how they are defined, and how they are applied in the

MidSouth District; whether the alleged use of a racial slur by Plaintiff was treated as a violation of a Cardinal Principle; UPS's policies concerning whether punishment for alleged misconduct, including violations of a Cardinal Principle, must be proportional to the conduct at issue; and whether employees who violated a Cardinal Principle have always been permanently terminated or whether some were suspended or received less serious discipline." (ECF Nos. 64-3 at PageID 237-38, 64-1 at PageID 226-27, 72.) The court finds this topic relevant and proportional, if the geographic and temporal limitations are added. The topic is modified to read: UPS's "Cardinal Principles," what they are, how they are defined, and how they are applied in UPS Package Distribution Centers in the Memphis Metropolitan Area; whether the alleged use of a racial slur by Plaintiff was treated as a violation of a Cardinal Principle; whether UPS's policies concerning whether punishment for alleged misconduct, including violations of a Cardinal Principle, must be proportional to the conduct at issue; and whether employees at Package Distribution Centers in the Memphis Metropolitan Area who violated a Cardinal Principle in the three years between May 23, 2020, and May 23, 2023, have been permanently

- 18 -

terminated or whether some were suspended or received less serious discipline.

### 9.  Dishonesty as an Offense

The ninth topic requests "UPS's policies regarding dishonesty by employees; whether dishonesty is considered a more or less serious offense than use of a racial slur under UPS's disciplinary framework; and how discipline for dishonesty has been applied in the MidSouth District in the last five years." (ECF Nos. 64-3 at PageID 238, 64-1 at PageID 228, 72.) Young has not met his burden of showing why information on how dishonesty is treated at UPS, even in comparison to the use of racial slurs, is relevant to the claims or defenses. See Billingsley, 2024 WL 1543767, at *3. Topic nine is stricken.

### 10.  UPS Hotline

The next topic requests information about "[t]he operation of UPS's employee hotline in the MidSouth District; whether any employee in the MidSouth District has ever called the hotline to complain about the use of a racial slur, or about physical violence or threats of physical violence; and the outcome of any such hotline complaints." (ECF Nos. 64-3 at PageID 238, 64-1 at PageID 228, 72.) For the same reasons discussed above, the geographic area and time period are too broad. Additionally, Young has not met his burden to show why physical violence or threats are relevant to the claims or defenses. Topic ten will be modified to

read: The operation of UPS's employee hotline in the Memphis Metropolitan Area; whether any employee working at the Oakhaven Package Distribution Center has ever called the hotline to complain about the use of a racial slur between May 23, 2020, to May 23, 2023; and the outcome of any such hotline complaints.

11.  Manager Termination Recommendations

Topic eleven asks "[w]hether any manager in the MidSouth District has ever recommended the termination of another manager, and that manager was not terminated; including who made the recommendation, which manager was the subject of the recommendation, the date or time period, and the reasons why termination was not carried out." (ECF Nos. 64-3 at PageID 238, 64-1 at PageID 228, 72.) Young fails to explain how this information would be relevant to any claim or defense at issue in this case. Therefore, this topic is stricken.

12.  Discipline for Dishonesty, Falsification, or Violation of Integrity Policy

Topic twelve seeks "[a]ll instances, between May 31, 2020, and the present, in which an employee was disciplined for dishonesty, falsification, or violation of the integrity policy, and in which any person who participated in the decision to terminate Young took part. For each instance, provide: (a) the identity of the disciplined employee; (b) date of discipline; (c) date of infraction; (d) act committed; (e) facts supporting the

allegation; (f) name and job title of all involved decisionmakers;
(g) discipline imposed; (h) reasons for discipline; (i) factors
considered in degree of discipline; (j) date of hire; (k) jobs
held and dates; (l) prior discipline received; (m) quality of
performance." (ECF Nos. 64-3 at PageID 238, 64-1 at PageID 228,
72.) As in topic nine, Young has not met his burden to sufficiently
explain why disciplinary information on the employees who
participated in Young's termination decision is relevant. Because
this information would not be relevant to any claim or defense at
issue in this case, topic twelve is stricken.

13.  Union Employees Accused of, but not Disciplined for,
     Dishonesty or Violation of Integrity Policy

Topic thirteen is stricken in its entirety for the same
reasons as topic twelve. Topic thirteen reads: "[a]ll instances,
between May 31, 2020, and the present, in which a union employee
was accused of, but not disciplined for, dishonesty or violation
of the integrity policy, and in which any person who participated
in the decision to terminate Young took part in the decision not
to discipline. For each instance, provide: (a) the identity of the
employee; (b) date accused; (c) date of alleged infraction; (d)
act alleged; (e) supporting facts; (f) names and titles of all
decisionmakers; (g) reasons for no discipline; (h) factors
considered; (i) date of hire; (j) jobs held; (k) prior discipline;

- 21 -

(l) quality of performance." (ECF Nos. 64-3 at PageID 228, 64-3 at PageID 228-29, 72.)

    14.   <u>Similarly Situated Employees Who Violated the Same Policy Young Allegedly Violated</u>

Topic fourteen requests information on "[a]ll instances, between May 31, 2020, and the present, in which a similarly situated employee violated the same policy Young allegedly violated, and the decision-making as to discipline by any person who participated in Young's termination. For each instance, provide: (a) identity of the employee; (b) date of discipline and type of discipline; (c) date of infraction; (d) act committed; (e) supporting facts; (f) names and titles of decisionmakers; (g) reasons for discipline; (h) factors considered; (i) date of hire; (j) jobs held; (k) prior discipline; (l) quality of performance." (ECF Nos. 64-3 at PageID 238,64-3 at PageID 226, 228, 72.) The court finds that this topic is already adequately covered by the prior topics (as modified above), and therefore topic fourteen is stricken.

    15.   <u>Managers Disciplined for or Accused of Same Misconduct as Young</u>

This topic requests information on "[a]ll instances, between May 31, 2020, and the present, in which a[] manager was disciplined for or accused of the same misconduct as Young, and the decision-making as to discipline." (<u>Id.</u> at PageID 239; ECF No. 64-1 at PageID 228, 72.) The court finds that after the modifications made

to topic three, topic fifteen is now redundant and is therefore stricken.

16. <u>Instances When Supervisees of Decision-Makers Were Accused of or Found to Have Committed Dishonesty, Falsification, or Violation of Integrity Policy</u>

This topic requests "[a]ll instances, between May 31, 2020, and the present, in which any person directly supervised by any person who participated in the decision to terminate Young was accused of or found to have committed dishonesty, falsification, or violation of the integrity policy." (ECF No. 64-1 at PageID 239, 72.) For the reasons discussed in topics nine, twelve, and thirteen above, accusations or findings of dishonesty are irrelevant, and even if relevant, are disproportional to the needs of this case. Thus, this topic is stricken.

17. <u>Demotions of Managers Who Were Supervised by Decision-Makers</u>

Topic seventeen requests information regarding "[a]ll instances, between May 31, 2020, and the present, in which any managers supervised by any person who participated in the decision to terminate Young were demoted. Information sought mirrors Topic 14." (<u>Id.</u>; ECF No. 64-1 at PageID 228, 72.) The court finds this information to be irrelevant and therefore will strike this topic.

18. <u>Affirmative Defenses</u>

This topic requests all facts underlying any affirmative defense asserted by Defendant. (<u>Id.</u> at PageID 239; ECF No. 64-1 at

- 23 -

PageID 226-27, 72.) The court finds that information regarding UPS's affirmative defenses is relevant and proportional to the needs of the case. As such, this topic will not be modified.

19. Complaints and Disciplinary Actions Against Goodwin and Kelley

Topic nineteen requests "[t]he details of complaints UPS received against Quenti[]n Goodwin and Naymeon Kelley, what the investigation revealed, and any d[is]c[i]plinary action against Goodwin or Kelley." (ECF No 64-3 at PageID 239.) UPS argues that this topic is irrelevant and does not concern individuals and incidents at issue in the current case. (ECF No. 64-1 at PageID 226, 72.) Although these individuals are named in topic four and the court permitted some discovery regarding their alleged use of racial slurs, it declines to order UPS to prepare their Rule 30(b)(6) witness to testify on any information about these two individuals beyond what was described in topic four. Topic nineteen is therefore stricken.

20. Roy Burgess Investigations and Discipline

This topic requests "[a]ll investigations of Roy Burgess for dishonesty, misuse of company resources, falsification of records, or misconduct; the decision-making process each time he was terminated and reinstated; identification of personnel who reinstated him, including those who authorized back pay or restoration of benefits." (ECF No. 64-3 at PageID 239, 72.) UPS

- 24 -

once again argues that this topic is irrelevant and does not concern individuals and incidents at issue in the current case. (ECF No. 64-1 at PageID 226, 72.) The court agrees. The information sought under this topic is wholly irrelevant to Young's claims. Therefore, topic twenty is stricken.

21.  Burgess's Illegal Training Scheme

As part of the information on Roy Burgess, Young requests "[d]etails of Roy Burgess's off-the-clock training of potential feeder drivers at the Bartlett facility, including use of UPS facilities, equipment, and fuel; the roles of Dwain Caskey and Demetrius Bell; reasons they were not disciplined; UPS's knowledge of these activities, including camera footage provided by Tad Nohsey and the involvement of Ron Barrett." (ECF Nos. 64-3 at PageID 239, 64-1 at PageID 226, 72.) Burgess's alleged schemes are irrelevant to Young's retaliation claims. With regard to Caskey, Bell, Nohsey, and Barrett's roles in this investigation, Young has not met his burden to demonstrate how they are relevant to the claims and defenses at issue. Thus, this topic is stricken.

22.  Differential Treatment in Discipline

As part of the information on Roy Burgess, Young also requests "[t]he basis for reinstating Roy Burgess multiple times despite repeated integrity violations, compared to discipline imposed on other employees, including Young; whether reinstatements were consistent with UPS policy." (ECF No. 64-3 at PageID 239, 72.) As

discussed in topics twenty and twenty-one, Young has failed to meet his burden of showing the relevance of the Burgess investigation. This topic is stricken.

23.  Kerry Niter and Myles Greene's Communications

This topic requests information regarding "[c]ommunications or meetings involving Niter and Greene where plans to terminate Young were discussed; their involvement in disciplinary processes against Young; their history of disciplinary or misconduct allegations, including expired licenses, insubordination, and misconduct." (ECF Nos. 64-3 at PageID 239, 64-1 at PageID 226, 72.) The court finds that any alleged communications regarding discussion of plans for Young's termination and the disciplinary process are covered by the prior topics (as modified). As for the remainder of this topic, the court finds that Young has not sufficiently demonstrated the relevance of this information. Topic twenty-three is stricken.

24.  Ben Davis's Knowledge

Topic twenty-four requests "[i]nformation provided to or known by Ben Davis regarding disciplinary actions, misconduct, or allegations against Niter and Greene; Davis's involvement in sit-downs with HR and Security over misconduct issues." (ECF Nos. 64-3 at PageID 239, 64-1 at PageID 226, 228, 72.) Once again, the court finds that Young has not met his burden to explain why information regarding disciplinary actions and misconduct

- 26 -

allegations against Niter and Greene is relevant. Topic twenty-four is stricken.

25.  Linda Allen's Complaints

This topic requests information on "[c]omplaints made by Linda Allen regarding harassment or discrimination by Niter, Greene, or others; actions UPS took in response; whether her reports corroborate Young's allegations." (ECF Nos. 64-3 at PageID 239, 64-1 at PageID 226, 228-29, 72.) Young does not explain why this information would be relevant to this case. Topic twenty-five is stricken.

26.  Pattern of Protection and Retaliation by Tim Steward

Topic twenty-six requests information regarding "[t]he role of Union Steward Tim Steward in protecting Greene, Niter, and others from discipline while targeting Young; UPS's knowledge of collusion or favoritism in the Feeder Department; examples of protected employees compared to Young." (ECF No. 64-3 at PageID 239, 72.) UPS argues that this topic would involve "information regarding bargaining unit employees who are wholly irrelevant to the case" since Young is a supervisory employee who would be subject to a completely different disciplinary process than union

employees. (ECF No. 64-1 at PageID 226, 229, 72.) The court finds that this topic seeks irrelevant information, and is stricken.

27.  Myles Greene's Disciplinary History

This topic requests "[a]ll instances where Greene was investigated, disciplined, or accused of misconduct since 2018; whether his badge was removed or he was walked out; why Greene remains employed despite repeated violation." (ECF No. 64-3 at PageID 240, 72.) UPS argues that this topic is not properly limited in scope, timing, or geographic area. (ECF No. 64-1 at PageID 228, 72.) As discussed in topic twenty-three, information regarding Greene's disciplinary history is irrelevant. Topic twenty-seven is stricken.

28.  Witnesses to Niter and Greene's Misconduct

Topic twenty-eight requests "[t]estimony and reports from Cheryl Saulsberry, Daniel Faulkner, and other UPS employees who witnessed misconduct by Greene, Niter, or their associates; whether UPS documented these witness accounts." (ECF Nos. 64-3 at PageID 240, 64-1 at PageID 226, 229, 72.) The court finds that information from witnesses regarding misconduct allegations against Niter and Greene is irrelevant. Topic twenty-eight is stricken.

29.  Fred Boyce Investigations, Discipline, and Reinstatement

This topic requests information on "[c]omplaints, grievances, and allegations made by Fred Boyce; HR investigations of his

grievance to CEO Carol Tomé; the 2024 incident where Boyce used racial slurs against white supervisors and Ann Hatley; the involvement of Ron Barrett and HR; the decision to reinstate Boyce within a week; UPS counsel interviews regarding FMLA handling and facility tours." (ECF Nos. 64-3 at PageID 240, 64-1 at PageID 226, 72.)

In this request, Young seems to seek information about an identified individual who worked at UPS and may have used racial or other slurs but was allegedly treated differently than Young. The court finds that this topic is relevant to Young's pretext argument. However, information about the complaints, grievances, and allegations made by Boyce and the HR investigation is too broad in scope. That portion of the topic is stricken. Further, Young has failed to demonstrate how his request for facility tours is relevant. As such, the last portion of the request, on facility tours, is stricken. The topic will read: The 2024 incident where Boyce used racial slurs against white supervisors and Ann Hatley; the decision to reinstate Boyce within a week.

30.  DOT Violations and Disparate Discipline

Topic thirty requests information about "[t]he incident where two African American drivers rode together while one lacked a valid DOT card; management's decision to allow it; the role of Mike Anderson; the absence of discipline; the subsequent termination of Tim Willis after a minor traffic accident; the reasons for

- 29 -

termination; the involvement of UPS HR and Security; whether these incidents reflect disparate treatment based on race." (ECF Nos. 64-3 at PageID 240, 64-1 at PageID 226, 72.) Young has not met his burden to demonstrate how this incident is relevant to the claims and defenses. This topic is stricken.

31.  Robert Robinson Incident

This topic requests another example of use of racial slurs: the "use of Racial Slurs Against Greg Morris – The incident where Robert Robinson, a Black feeder driver, called Greg Morris, a Black part-time supervisor, the 'N-Word' and 'Uncle Tom'; Morris's report to Ben Davis and Ron Barrett; documentation by Security and Management; HR's failure to act; reasons Robinson was not disciplined compared to others accused of using slurs; whether policy was consistently applied." (ECF Nos. 64-3 at PageID 240, 64-1 at PageID 226, 72.)

The court finds that information about an incident involving individuals who worked at UPS and may have used racial slurs but received different treatment from Young is relevant and proportional to the needs of the case. However, the "topic" of HR's failure to act or apply the policy consistently is more argument than actual deposition topics. This topic is modified to read: The incident where Robert Robinson, a Black feeder driver, called Greg Morris, a Black part-time supervisor, the "N-Word" and "Uncle Tom"; Morris's report to Ben Davis and Ron Barrett;

- 30 -

documentation by Security and Management; reasons Robinson was not disciplined.

32. Safety Incidents, Audits, and Reinstatements

Topic thirty-two requests information regarding "[t]he escalation of accidents, property damage, and injuries at Oakhaven since Young's termination; UPS's decision to suspend safety training and safety rides to cover the yard; the corporate audit of Oakhaven; reassignment of Kerry Niter to Young's position; the termination and pending reinstatement of Darrius Stone for harassment of Michelle Muhammad; comparison to treatment of other employees." (ECF Nos. 64-3 at PageID 240, 64-1 at PageID 226, 229, 72.) Young has not shown why safety incidents that have occurred since his termination are relevant to the claims and defenses. This topic is stricken.

33. Comparators

The final topic appears to pose a question to UPS of "[w]hether any of the above are com[]parators. If not, why not?" (ECF No. 64-3 at PageID 240, 72.) This topic is stricken.

### III. CONCLUSION

For the above reasons, the Motion for a Protective Order and Motion to Compel are GRANTED in part and DENIED in part. Young is therefore granted twenty days in which to take the Rule 30(b)(6) deposition, using the topics as modified above. Following the

deposition, he will have forty-five days to respond to the

Defendant's Motion for Summary Judgment.[6]

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

March 31, 2026
Date

---

[6]Alternatively, should the District Judge instead choose to deny
Defendant's Motion for Summary Judgment without prejudice with
the right to refile the motion after the deposition, the parties
will follow the briefing schedule set by the District Judge.